**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

THOMAS MILLER,

       Plaintiff,

v.                                 Case No:  6:13-cv-1016-Orl-40KRS

JOHNSON & JOHNSON, JANSSEN
PHARMACEUTICALS,   INC.,   and
YALE ASSOCIATES, INC.,

       Defendants.

_____

## <u>OMNIBUS ORDER</u>

This cause comes before the Court on the following:

1.  Defendants' Motion for Summary Judgment (Doc. 56), filed August 1, 2014;

2.  Plaintiff's Response in Opposition to Defendants J&J's Motion for Summary Judgment (Doc. 74), filed August 15, 2014;

3.  Defendants' Reply to Plaintiff's Response in Opposition to Defendants', Johnson & Johnson and Janssen Pharmaceuticals, Motion for Summary Judgment (Doc. 77) filed August 29, 2014;

4.  Defendant Yale Associates, Inc.'s Motion for Summary Judgment and Incorporated Memorandum of Law (Doc. 64), filed August 1, 2014;

5.  Plaintiff's Response in Opposition to Yale Associate, Inc.'s Motion for Summary Judgment (Doc. 73), filed August 15, 2014;

6.  Defendant Yale Associate, Inc.'s Reply to Plaintiff's Response in Opposition to Yale Associate's Motion for Summary Judgment (Doc. 76), filed August 29, 2014;

7. Plaintiff's Motion for Partial Summary Judgment Regarding Defendants Johnson & Johnson and Janssen Pharmaceuticals Liability as to Count I and II of the Complaint and Incorporated Memorandum of Law (Doc. 65), filed August 1, 2014; and

8. Defendants' Response to Plaintiff's Motion for Partial Summary Judgment Regarding Defendants, Johnson & Johnson and Janssen Pharmaceuticals Liability as to Count I and II of the Complaint (Doc. 71), filed August 15, 2014.

Upon consideration and review of the record, including all pleadings, deposition transcripts, affidavits, exhibits, and memoranda of respective counsel, the Court concludes that Plaintiff is entitled to summary judgment on Counts 1 and 2 of the Complaint on the issue of liability.  The Court further concludes that Defendant Yale Associates, Inc. is entitled to summary judgment on Count 3.

## I.    BACKGROUND

### A.    Facts[1]

In May 2011, Plaintiff, Thomas Miller II ("Miller"), submitted his name to Defendants, Johnson & Johnson and Janssen Pharmaceuticals, Inc. (collectively, "J&J"),[2] for a position as an Area Business Specialist in Orlando, Florida.  Miller subsequently participated in a series of interviews, including a telephone interview with J&J's recruiter, Amy Gilland Mitchell ("Gilland Mitchell"), and two in-person interviews with J&J's district manager, Jim Lather ("Lather").  On June 9, 2011, Miller completed and submitted a

---

1. Unless otherwise indicated, the Court gathers this account of the facts from the parties' Joint Stipulation of Agreed Material Facts (Doc. 72).
2. Defendant Janssen Pharmaceuticals, Inc. is a wholly owned subsidiary of Defendant Johnson & Johnson.  (*Id.* ¶ 1).

formal application for the position.

On June 28, 2011, Miller received a contingent offer letter of employment from J&J. The offer letter stated that Miller's employment was contingent on his successful completion of a background check. Miller acknowledged the offer letter with his signature. In furtherance of the required background check, Miller additionally signed an authorization for release of information to Defendant, Yale Associates, Inc. ("Yale"). Following receipt of Miller's executed authorization for release of information, Yale conducted Miller's background check. On July 6, 2011, Yale issued a consumer report (the "background report") resulting from its check of Miller's background and notified Gilland Mitchell of the results. Based on Yale's background report, Gilland Mitchell flagged Miller's application for further review. According to Miller, Gilland Mitchell called him on July 12, 2011 to inform him that J&J was rescinding his offer of employment due to information contained in the background report. (Doc. 65, pp. 3–4). Although J&J admits that Gilland Mitchell spoke with Miller on this date, J&J disputes that it had revoked Miller's offer of employment at this time. (Doc. 56, p. 5).

On July 18, 2011, Yale mailed a package to Miller containing a copy of the background report and a letter that included a summary of Miller's rights, as required by federal law. Yale's Client Services Manager, David Hinman ("Hinman"), signed the letter and included his telephone number for Miller to call to dispute any inaccurate information contained in the background report. Miller received the package on July 21, 2011. Upon receiving and reviewing his background report, Miller contacted Lather and Gilland Mitchell to dispute certain criminal activity that had been incorrectly listed in the background report. Gilland Mitchell directed Miller to contact Yale to dispute any inaccurate information.

Having not received a response from Miller, Yale mailed an adverse action letter to Miller on July 25, 2011 stating that his offer of employment with J&J had been withdrawn based, at least in part, on information contained within the background report. Miller received the adverse action letter on July 26, 2011.  Miller first contacted Yale to dispute the criminal information listed in the background report on August 4, 2011. Although Hinman was not available at that time, Miller spoke with Hinman the next day and informed him of the inaccurate information.  Yale then re-investigated Miller's criminal background, corrected the inaccurate information, and forwarded a new background report to J&J on August 11, 2011.  However, by the time J&J received Miller's corrected background report, the position for which Miller had applied was no longer available.

**B.    Procedural History**

On July 3, 2013, Miller initiated this lawsuit against J&J and Yale for violating the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681–1681x.  (Doc. 1).  Miller states three claims for relief.  Counts 1 and 2 allege that J&J failed to provide Miller with a pre-adverse action disclosure and a pre-adverse action opportunity to dispute the accuracy of the background report in violation of 15 U.S.C. § 1681b(b)(3).  (*Id.* ¶¶ 28–39).  Count 3 alleges that Yale failed to maintain reasonable procedures to filter and verify disputed information in his credit file and relied upon a source that Yale knew was unreliable in violation of 15 U.S.C. § 1681i.  (*Id.* ¶¶ 40–42).

The parties now move for summary judgment.  J&J moves for summary judgment on Counts 1 and 2.  (Doc. 56).  Miller cross moves for partial summary judgment on these counts, but only as to J&J's liability under the FCRA.  (Doc. 65).  Yale moves for summary judgment on Count 3.  (Doc. 64).  All parties have briefed their respective positions or the time for doing so has passed.

## II.    STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment must "cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials" to support its position that it is entitled to summary judgment. Fed. R. Civ. P. 56(c)(1)(A). However, "[t]he court need not consider only the cited materials" and may consider any other material in the record. Fed. R. Civ. P. 56(c)(3).

An issue of fact is "genuine" only if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if the fact could affect the outcome of the lawsuit under the governing law. *Id.* The moving party bears the initial burden of identifying those portions of the record demonstrating a lack of genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004). If the movant shows "an absence of evidence to support the nonmoving party's case," the burden then shifts to the non-moving party to demonstrate that there are, in fact, genuine disputes of material facts. *Celotex*, 477 U.S. at 325; *see also Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006). To satisfy its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, the non-movant must go beyond the pleadings and "come forward with specific facts showing that there is a genuine issue for trial." *Id.* at 587.

In determining whether a genuine dispute of material fact exists, the Court must read the record and the evidence presented in the light most favorable to the non-moving party. *See Porter*, 461 F.3d at 1320. Summary judgment should only be granted "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita*, 475 U.S. at 587.

## III.   DISCUSSION

### A.   Statutory Context

"[A] product of the consumer movement of the 1960s," the FCRA demarcates the standards and responsibilities of consumer reporting agencies and illuminates the rights of individuals who are subjects of consumer reports. Roger D. Blair & Virginia Maurer, *Statute Law and Common Law: The Fair Credit Reporting Act*, 49 Mo. L. Rev. 289, 302 (1984); *see also* 15 U.S.C. § 1681(b) (describing the purposes of the FCRA to include ensuring fair and equitable treatment of consumers by consumer reporting agencies and safeguarding the confidentiality and accuracy of consumer credit information). The FCRA imposes both criminal and civil liability for violation of its provisions. 15 U.S.C. §§ 1681n, 1681o, 1681q, 1681r. As to civil actions, the FCRA affords a two year statute of limitations from a plaintiff's discovery of a violation and a five year absolute statute of limitations for any violation. *Id.* § 1681p.

Relevant to the instant case, any person[3] who uses a consumer report for employment purposes must provide the consumer[4] with a copy of the consumer report and a summary of rights before taking any adverse action based on information contained

_____

3.  The FCRA defines "person" to include corporations. 15 U.S.C. § 1681a(b).
4.  The FCRA defines "consumer" as "an individual." *Id.* § 1681a(c).

in the consumer report. *Id.* § 1681b(b)(3)(A).[5]  Section 1681g outlines the information to be conveyed in the summary of rights.  That information includes the right of the consumer to obtain a copy of his consumer report from the consumer reporting agency, his right to dispute inaccurate information, and the method by which he can contact the consumer reporting agency to dispute such inaccuracies.  *Id.* § 1681g(c)(1)(B).  The purpose of providing this information is to give current or prospective employees the opportunity to discuss and clarify information in a background report with the employer before adverse action is taken.  *Goode v. LexisNexis Risk & Info. Analytics Grp., Inc.*, 848 F. Supp. 2d 532, 537 (E.D. Penn. 2012) (citing Lynne B. Barr & Barbara J Ellis, *The New FCRA: An Assessment of the First Year*, 54 Bus. Law. 1343, 1348 (1999)).

Section 1681i provides the procedure for consumer reporting agencies to investigate inaccuracies in a consumer report.  When an individual informs a consumer reporting agency of an inaccuracy, the consumer reporting agency must "conduct a reasonable reinvestigation" at no cost to the individual within thirty days.  *Id.* § 1681i(a)(1)(A).  Within five days of a consumer providing notice to the consumer reporting agency of inaccurate information, the consumer reporting agency must notify any source who provided the information in dispute with all relevant information pertaining to the dispute. *Id.* § 1681i(a)(2)(A).  If after reinvestigation the consumer reporting agency determines that the disputed information is inaccurate, incomplete, or cannot be verified, the consumer reporting agency must delete or modify the disputed information and promptly notify the source who provided the information that it has been deleted or

---

5. Not all adverse actions require notice.  Only adverse actions that are based, in whole or in part, on information contained within the background report fall within the FCRA's notification requirement.  *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 63 (2007).

modified.  *Id.* § 1681i(a)(5)(A).  Finally, the consumer reporting agency must notify the consumer of the results of its reinvestigation along with certain other statutorily required information.  *Id.* § 1681i(a)(6).

The FCRA imposes civil liability on persons who willfully or negligently fail to comply with its requirements.  *Id.* §§ 1681n, 1681o.  A finding of willful noncompliance under § 1681n entitles the prevailing party to (i) either actual damages suffered by the consumer or statutory damages of not less than $100 and not more than $1,000, (ii) punitive damages as the court may allow, and (iii) reasonable attorney's fees and costs of litigation.  *Id.* § 1681n(a).  A finding of negligent noncompliance under § 1681o entitles the prevailing party to actual damages plus reasonable attorney's fees and costs of litigation.  *Id.* § 1681o(a).

**B.    J&J's Motion for Summary Judgment and Miller's Cross Motion for Partial Summary Judgment as to J&J's Liability**

J&J moves for summary judgment on Counts 1 and 2 of Miller's Complaint. (Doc. 56).  Those Counts allege that J&J violated the FCRA by failing to provide Miller with a pre-adverse action disclosure as required by 15 U.S.C. § 1681b(b)(3).[6]  (Doc. 1, ¶¶ 28–39).  J&J challenges Miller's claims on four grounds.  First, J&J contends that its internal decision to rescind Miller's conditional offer of employment does not constitute an "adverse action" as defined by the FCRA and interpreted by the courts.  (Doc. 56, pp. 9–12).  Second, J&J states that Miller failed to properly dispute his background check with Yale, thus precluding liability under the FCRA.  (*Id.* at pp. 12–13).  Third, J&J argues that

---

6.  As an initial matter, none of the parties dispute that Miller is a "consumer," J&J is a "person," Yale is a "consumer reporting agency," and J&J utilized Miller's background report for employment purposes, all within the meaning of the FCRA.  *See* 15 U.S.C. § 1681a.

Miller cannot recover under the FCRA because he has not suffered any actual damages flowing from an alleged violation. (*Id.* at pp. 13–15). Fourth, J&J states that Miller cannot demonstrate that any violation of the FCRA was willful or negligent and that J&J cannot be held responsible for a mere technical violation of the statute. (*Id.* at p. 15).

Miller cross moves for partial summary judgment on Counts 1 and 2 only as to the issue of J&J's liability under the FCRA. (Doc. 65). Miller argues that J&J failed to provide him with a pre-adverse action notice as required by the FCRA before rescinding its offer of employment. (*Id.* at pp. 9–14). Miller states that the issues of damages and whether J&J's violation was willful or negligent should be reserved for trial. (*Id.* at p. 1).

### 1.    J&J Violated the FCRA by Failing to Provide Pre-Adverse Action Notice Prior to Taking Adverse Action

As outlined above, the FCRA requires an employer to provide a current or prospective employee with a pre-adverse action notice which contains a copy of the background report relied upon and a statutory summary of rights prior to taking any adverse action on that employee's current or prospective employment. 15 U.S.C. § 1681b(b)(3). The FCRA defines an "adverse action" to include "a denial of employment or any other decision for employment purposes that adversely affects any current or prospective employee." *Id.* § 1681a(k)(1)(B)(ii).

J&J asserts that it could not have violated the FCRA because it never took an adverse action against Miller prior to Yale sending Miller the July 18, 2011 pre-adverse action package. (Doc. 56, pp. 9–12). According to J&J's timeline of events, J&J received Miller's background report from Yale on July 6, 2011. (Doc. 72, ¶ 7). At that time, Gilland Mitchell flagged Miller's application for further review because of the criminal history information contained in the background report. (Doc. 56, p. 4). J&J then notified Yale

of its intent to rescind its offer of employment to Miller, causing Yale to mail the July 18th pre-adverse action package.  (*Id.* at p. 5).  Although Miller received the pre-adverse action package on July 21st, he failed to contact Yale within a reasonable time to dispute the inaccurate criminal history information.  (*Id.* at pp. 5–6).  Consequently, Yale informed Miller by mail on July 25th that J&J had revoked his offer of employment.  (*Id.* at p. 7). J&J states that, although it may have made an internal decision to revoke Miller's offer based on the criminal information contained in the background report, such an internal decision is not an "adverse action" within the meaning of the FCRA.  (*Id.* at pp. 9–12).

Miller argues that he is entitled to summary judgment on the issue of J&J's liability because J&J indeed took adverse action before Yale issued the July 18th pre-adverse action package.  (Doc. 65, pp. 9–12).  Miller states that J&J contacted him prior to July 18th to advise him that his offer of employment had been withdrawn.  (*Id.* at p. 12). As a result, J&J's conduct was more than a mere internal decision as J&J submits, but rather the actual and operative withdrawal of Miller's offer of employment.  (*Id.*).

Based on the particular facts of this case, as highlighted by the evidence and testimony presented by the parties, there is no dispute that J&J took adverse action against Miller prior to Yale mailing the July 18th pre-adverse action package.  Miller testified at his April 15, 2014 deposition as follows:

> Q.  When is the next time you have any communication with [Gilland Mitchell]?[7]
>
> A.  July 12.
>
> Q.  And what happens on July 12?

---

7. Gilland Mitchell is a Senior Recruiter with J&J and has worked for J&J for eleven years. (Doc. 57-1, ¶ 1; Doc. 58-1, 9:1–14).

A.      It was approximately 5:45 in the afternoon; I was in New Brunswick, Georgia and she informed me that the offer had been officially rescinded.  I queried her as to why.  She said that it was something contained during [sic] the background screening and that J&J Global Security made this determination.  I asked her what it was and she said, she couldn't tell me.

        . . . .

Q.      Did [Gilland Mitchell] have any other discussions with you on July 12 regarding the issue with your background?

A.      I expressed disappointment.  I asked her if there was anything that could be done because I was confident an error had been made.  She said this is where we are.  And I think it ended rather abruptly.

(Doc. 60, 54:3–55:4; *see also id.* at 58:15–59:20 & Ex. 10).  Miller's Verizon phone bill confirms that, on July 12, 2011 at 5:25 p.m., Miller spoke with Gilland Mitchell for six minutes.[8]  (Doc. 63-16, p. 5).

J&J's internal emails and Gilland Mitchell's deposition testimony further corroborate Miller's statement that J&J officially rescinded the offer of employment and communicated the rescission to Miller on July 12th, prior to Yale sending the pre-adverse action package.  By email time-stamped 5:52 p.m. on July 12, 2011,[9] Gilland Mitchell wrote to Yolanda Nieves, "Heads-up, I'm attaching the note from J&J Corporate Security.  Due to his background check he is no longer able to be rehired.  I've not had this situation happen before but heads-up."  (Doc. 63-3, p. 1).  Then, by email time-stamped 7:03 p.m.

---

8. Miller's phone records specifically show that he spoke with someone whose phone number was 904-814-8244.  (Doc. 63-16, p. 5).  Gilland Mitchell testified at her deposition that her personal office phone number is 904-814-8244.  (Doc. 58-1, 7:3–11).  Gilland Mitchell otherwise does not dispute that she spoke with Miller at this time.

9. The subject line of the email reads, "RE: Thomas Miller - Req. 8058110516- ABS-Janssen- Orlando, FL- DM- Jim Lather – CONFIDENTIAL [sic]."  (Doc. 63-3, p. 1).

on July 12, 2011,[10] Gilland Mitchell wrote to other individuals:

> Just so you are aware due to the background check we are not in a position to move forward.  I just received the data from J&J Corp Security.  I will alert the Service Center as soon as I close the official loop with the candidate.  I just talked to the [District Manager] and he is aware so we'll be moving on from this one.

(Doc. 63-2, p. 1).  At her May 13, 2014 deposition, Gilland Mitchell testified about the

July 12th emails as follows:

> Q.   Does Exhibit 2 reflect an E-mail chain that you were involved in?
>
> A.   Yes.
>
> Q.   Does Exhibit 2 reflect that a decision has been made that Mr. Miller is not eligible to be rehired?
>
>       . . . .
>
> A.   So via just this statement, it indicates, obviously, a note from corporate security, but it doesn't have the additional – it doesn't have any additional information other than, on that specific date, via the team that we had highlighted earlier is what this indicates.
>
> Q.   So Exhibit 2 indicates that the team that we discussed earlier had made a decision in regards to Mr. Miller[?]
>
> A.   As I indicated, they reviewed the documentation and – the combination of those individuals, and then, obviously, made a determination.
>
> Q.   Did that determination occur before you sent Yolanda Nieves an E-mail on July 12 at 5:52 p.m.?
>
> A.   *That would have had to occur then prior to that.*

(Doc. 58-1, 48:19–49:17) (emphasis added).

---

10.  The subject line of the email reads, "RE: Draft: Offer Letter- Thomas Miller - Req. 8058110516- ABS- Janssen- Orlando, FL[614872] [T2639033Z616536]- UPDATE." (Doc. 63-2, p. 1).

The next day at approximately 12:53 p.m., Gilland Mitchell emailed Yolanda Nieves again[11] regarding the decision to rescind Miller's offer: "It was VERY odd and we were shocked!!! I'm not sure how this wasn't captured it doesn't make ANY sense.  But it's a CLEAR NO GO which is such a shame!!!!!!!!!!!"  (Doc. 63-22, p. 1) (alterations in original).  Finally, by email time-stamped 3:40 p.m. on July 18, 2011,[12] Gilland Mitchell writes, "I talked to Monique the other day and we were on the line with YALE.  We have resended [sic] the offer due to his background.  This was sent to BBHR and J&J Corp Security as well."  (Doc. 63-5, p. 1).

J&J relies heavily on *Obabueki v. International Business Machines Corp.*, 145 F. Supp. 2d 371 (S.D.N.Y. 2001), *aff'd* 319 F.3d 87 (2d Cir. 2003), *cert. denied* 540 U.S. 940 (2003), in claiming that J&J only made an internal decision to revoke Miller's offer of employment, which does not constitute an adverse action under the FCRA.  (Doc. 56, pp. 9–11; Doc. 71, pp. 5–7).  In *Obabueki*, the plaintiff interviewed and received a conditional offer of employment for a position with IBM.  *Id.* at 376.  IBM then contracted with a consumer reporting agency to conduct a background check, which revealed that the plaintiff had been convicted of a crime which he failed to divulge on his employment application.  *Id.* at 377.  However, the background report did not disclose that the plaintiff's conviction had been dismissed.  *Id.*

As a result of the information contained within the background report, IBM called the plaintiff on October 13, 1999 to inform him that IBM intended to withdraw its offer of

---

11. The subject line of the email reads, "RE: Thomas Miller – Req. 8058110516- ABS- Janssen- Orlando, FL- DM- Jim Lather – CONFIDENCIAL [sic]."  (Doc. 63-22, p. 1). This email is part of the July 12, 2011 email chain with Yolanda Nieves cited in footnote 9.
12. The subject line of the email reads, "RE: Call Me: Peding [sic] Background for Thomas Miller 8058110516[T2643308Z631445]."  (Doc. 63-5, p. 1).

employment. *Id.* IBM also mailed a letter to the plaintiff the same day memorializing IBM's intent. *Id.* Attached to the letter was a copy of the plaintiff's background report and the statutory summary of rights required by the FCRA. *Id.* Although the plaintiff attempted to dispute the inaccurate information contained within his background report, he was unable to present enough evidence to convince IBM to change its mind. *Id.* at 378. Accordingly, by letter dated October 18, 1999, IBM formally withdrew the plaintiff's offer of employment. *Id.*

The plaintiff in *Obabueki* ultimately sued IBM for violating the FCRA. He contended that IBM took an adverse action against his prospective employment prior to providing the statutorily required pre-adverse action notice. *Id.* at 378. Specifically, the plaintiff asserted that IBM had taken adverse action on October 13th by informing him via telephone and letter that it intended to withdraw its offer of employment due to the information contained within the background report. *Id.* at 391. On motion for summary judgment, IBM submitted that it had not taken adverse action until October 18th, after IBM had provided the required pre-adverse action notice and summary of rights. *Id.* at 392. As to the October 13th communications, IBM stated that it merely formed the intent to take adverse action, which it claimed was not violative of the FCRA. *Id.* at 377.

The district court agreed with IBM. Crucial to the court's decision was its analysis of what constitutes an "adverse action" under the statute:

> An internal decision to rescind an offer is not an adverse action. The FCRA defines "adverse action," *inter alia*, as the "*denial of employment* or any other decision for employment purposes that *adversely affects* any current or prospective employee." Clearly, plaintiff did not suffer any adverse effect until his offer of conditional employment was withdrawn on October 18, 1999. Plaintiff concedes this point in his own moving papers, where he states that "what matters is not what IBM said, but what IBM did." IBM's internal discussions had

> no impact on plaintiff; only when its staff acted by letter did
> IBM take any action.

*Id.* at 391–92 (citations and footnote omitted) (emphasis in original).  The court found legally unsupportable the plaintiff's contention that a formation of the intent to withdraw an offer of employment constitutes an adverse action.  Such a construction, the court held, would render the statute's notice requirement without effect, as anyone could claim a violation of the FCRA where an employer sends a pre-adverse action notice, asserting that the employer's decision was actually made before the notice had been sent.  *Id.* at 392 & n.31.  Moreover, the court emphasized that the FCRA "expressly allows" employers to form an intent to take adverse action before doing so.  *Id.* at 392.  Therefore, under the FCRA, it is the actual decision to rescind that operates as an adverse action.  *Id.*  Only then is the plaintiff "denied employment" or "adversely affected" within the meaning of the statute.

Other federal courts have arrived at the same conclusion reached in *Obabueki*. For example, in *Burghy v. Dayton Racquet Club, Inc.*, the court described an "adverse action" as "occur[ring] when the decision is carried out, when it is communicated or actually takes effect, and an actor has until that time to take the necessary steps to comply with the FCRA's requirements."  695 F. Supp. 2d 689, 703 (S.D. Ohio 2010).  In that case, the court posited that an employer who communicates to an employee during a staff meeting that she is fired has taken an adverse action.  *See id.*  Similarly, in *Goode v. LexisNexis Risk & Information Analytics Group, Inc.*, the court stated that an adverse action takes place where "there [is] no real opportunity for [the employee] to contest" the employment decision, thus defeating the purpose of the FCRA.  848 F. Supp. 2d 532, 540 (E.D. Penn. 2012).  *See also Moore v. Rite Aid Headquarters Corp.*, No. 13-1515,

2014 WL 3735568, at *4 (E.D. Penn. July 30, 2014) (holding that adverse action occurs when a decision is carried out, communicated, or takes effect).

Here, there is no dispute that J&J took adverse action against Miller prior to Yale mailing the July 18th pre-adverse action package.  Miller testified that he spoke with Gilland Mitchell on July 12, 2011, when Gilland Mitchell conveyed to Miller that the job offer had been rescinded.  Miller's telephone bill confirms that a conversation between the two took place on this date and Gilland Mitchell's deposition testimony and emails to numerous individuals on July 12th and 13th corroborate that the nature of the conversation was to inform Miller that his job offer had been revoked.  Further, at no point in her deposition testimony or by way of sworn affidavit does Gilland Mitchell deny that this was the nature of their conversation.  Finally, even construing the evidence and testimony discussed above as generously as possible in J&J's favor, Gilland Mitchell admitted by email dated July 18, 2011 (the same day Yale shipped the pre-adverse action package) that J&J had already rescinded Miller's offer of employment.  Clearly, J&J did not provide the statutorily required pre-adverse action notice to Miller before July 18th prior to taking adverse action against Miller's prospective employment.

J&J's reliance on *Obabueki* is misplaced, as the facts presented in the instant case are distinguishable.  In *Obabueki*, IBM gave pre-adverse action notice to the plaintiff on October 13th, afforded him five days to dispute any inaccuracies in the background report, then formally withdrew the offer on October 18th.  Because October 18th was the date the withdrawal took effect, that was the date of adverse action.  Since IBM had provided the proper notice and summary of rights five days prior, IBM did not violate the FCRA.  In the instant case, however, J&J's actions went beyond a mere internal decision to rescind Miller's offer.  Gilland Mitchell stated in no uncertain terms on July 18th, "We have

resended [sic] the offer due to his background." (Doc. 63-5, p. 1). Therefore, the date on which J&J carried out its decision to withdraw Miller's offer occurred on or before July 18, 2011, thus denying Miller any opportunity to dispute inaccurate information in the background report in violation of the FCRA.

J&J's contention that Miller knew of J&J's intent to take an adverse action but failed to dispute the inaccurate criminal information with Yale is similarly unfounded. J&J suggests that "Miller <u>had</u> a genuine opportunity to contest the accuracy of his background report and inexplicably <u>failed</u> to contest the accuracy of his report when he chose to ignore the pre-adverse action letter's instructions to contact Yale." (Doc. 56, p. 6; Doc. 77, p. 6) (alterations in original). Indeed, J&J goes to great lengths to paint a picture of Miller purposely ignoring Yale's pre-adverse action package, presumably to his detriment. (Doc. 56, pp. 5–7, 12–13; Doc. 71, pp. 4, 9–11; Doc. 77, pp. 2–7). However, as discussed above, by the time Yale mailed the pre-adverse action package on July 18th, it was too late—J&J had already taken adverse action against Miller. Like the plaintiff in *Goode*, Miller quite literally had no opportunity to dispute the inaccurate criminal information contained within his background report before J&J rescinded the offer of employment.

For these reasons, the Court finds that there is no genuine dispute of material fact as to J&J's liability under the FCRA.

### 2. Genuine Dispute of Material Fact Exists as to Miller's Damages

Next, J&J moves for summary judgment on the basis that Miller did not suffer any damages as a result of a violation of the FCRA. (Doc. 56, pp. 13–15). J&J rightly points out that the FCRA does not impose liability for mere technical violations of its provisions; a plaintiff must actually suffer injury in order to prevail on his claim. *Johnson v. Equifax, Inc.*, 510 F. Supp. 2d 638, 647 (S.D. Ala. 2007); *see also Cahlin v. Gen. Motors*

*Acceptance Corp.*, 936 F.2d 1151, 1161 (11th Cir. 1991) (affirming summary judgment for defendant-employer where the plaintiff failed to provide evidence that he suffered injury due to FCRA violation).

However, Miller provides ample evidence that he incurred actual damages as a result of J&J's violation of the FCRA.  Miller testified at his deposition that, had he been allowed to work for J&J, he would have earned a base salary of $105,000 per year plus bonuses and benefits.  (Doc. 60-1, 45:13–46:10; *see also* Doc. 58-1, Ex. 3).  Since having his offer of employment rescinded at J&J, Miller testified that he has worked in a number of positions, all of which have paid less than what he would have earned at J&J.  (Doc. 60-1, 24:2–26:20).  Lost wages found to be caused by a violation of the FCRA are actual damages.  *See, e.g.*, *Smith v. LexisNexis Screening Solutions, Inc.*, No. 13-CV-10774, 2014 WL 7403890, *13 (E.D. Mich. Dec. 30, 2014).  Accordingly, Miller has demonstrated a genuine dispute of material fact and the parties will proceed to trial on the issue of damages.

> **3.  Genuine Dispute of Material Fact Exists as to the Willfulness or Negligence of J&J's Violation**

Lastly, J&J moves for summary judgment on the grounds that its actions were neither willful nor negligent, thus escaping liability under the FCRA.  (Doc. 56, p. 15).  J&J reaches this conclusion by re-arguing that, since it complied with the FCRA, J&J necessarily could not have negligently or willfully violated the FCRA.  (*Id.*).  However, as illuminated in Section III.B.1, *supra*, J&J did not comply with the FCRA.  Moreover, the question of whether an employer acted willfully or negligently "is understood to be a question of fact for the jury." *Cowley v. Burger King Corp.*, No. 07-21772-CIV, 2008 WL 8910653, at *4 (S.D. Fla. May 23, 2008); *see also Hammer v. JP's SW Foods, L.L.C.*,

739 F. Supp. 2d 1155, 1167 (W.D. Mo. 2010); *Edwards v. Toys "R" Us*, 527 F. Supp. 2d 1197, 1210 (C.D. Cal. 2007).

Here, Miller's deposition testimony rebuts J&J's assertion that there is no dispute of material fact.  Miller testified that the fact that J&J never gave him an opportunity to dispute inaccuracies in his background report indicate J&J's negligence or willfulness. (*See* Doc. 60-1, 103:2–18).  Miller essentially states that the timeline of events in this particular case show that J&J must have acted willfully or negligently—*i.e.*, no reasonable person would view J&J sending a pre-adverse action notice *after* the occurrence of an adverse action as anything but willful or negligent.  (*See id.*).  Therefore, genuine dispute exists as to whether J&J acted negligently or willfully when it violated the FCRA, an issue on which the parties will also proceed to trial.

### C.    Yale's Motion for Summary Judgment

Yale moves for summary judgment as to Count 3 on several grounds, only one of which the Court need address in order to grant Yale's motion.  Yale contends that there is no genuine dispute of material fact that Yale complied with the FCRA's procedural requirements under 15 U.S.C. § 1681i for reinvestigating information contained within a consumer report which a consumer disputes.  (Doc. 64, p. 6).  Specifically, Yale states that it did not learn that Miller disputed information contained within his background report until Miller called Yale on August 4, 2011.  (*Id.* at p. 5).  After discussing the matter with Miller, Yale states that it reinvestigated, removed the inaccurate information, and forwarded a corrected background report to J&J by August 11th, as required by § 1681i. (*Id.* at p. 4).

In his response to Yale's motion for summary judgment, Miller does not discuss Yale's alleged violation of the FCRA's reinvestigation procedures.  (*See* Doc. 73).

Instead, Miller raises for the first time a violation of 15 U.S.C. § 1681e(b) and declares that there is sufficient factual dispute on that claim for him to survive summary judgment.[13] (*Id.* at pp. 7–14). Such argument is improper. It is well-established in the Eleventh Circuit that "[a] plaintiff may not amend [his] complaint through argument in a brief opposing summary judgment." *Lightfoot v. Henry Cnty. Sch. Dist.*, 771 F.3d 764, 779 (11th Cir. 2014) (quoting *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004)) (internal quotation marks omitted). Even under the liberal notice pleading standards of the Federal Rules of Civil Procedure, the unfairness of allowing a plaintiff to raise new claims in response to a defendant's motion for summary judgment should be obvious. *See id.* As such, the Court declines to consider any argument on Yale's alleged liability under § 1681e(b) and will limit its analysis to § 1681i.

Miller does not dispute that Yale first learned of the contested information on August 4th, reinvestigated, removed the inaccurate information, and forwarded a corrected background report to J&J by August 11th. (Doc. 72, ¶ 12). Miller offers no other evidence in his response to refute Yale's showing that it complied with § 1681i. Accordingly, Miller has failed to go beyond the pleadings to demonstrate that there is a genuine dispute of material fact. *Matsushita*, 475 U.S. at 586. Yale's motion for summary judgment will be granted.

## IV. CONCLUSION

For the reasons stated herein, it is **ORDERED AND ADJUDGED** as follows:

1. Defendants' Motion for Summary Judgment (Doc. 56) is **DENIED**.

---

13. Section 1681e(b) requires consumer reporting agencies such as Yale to "follow reasonable procedures to assure maximum possible accuracy of the information" contained within a consumer report.

2. Defendant Yale Associates, Inc.'s Motion for Summary Judgment (Doc. 64) is **GRANTED**.

3. Plaintiff's Motion for Partial Summary Judgment Regarding Defendants Johnson & Johnson and Janssen Pharmaceuticals Liability as to Count I and II of the Complaint (Doc. 65) is **GRANTED**.  The parties will proceed to trial on the issues described in this Order.

**DONE AND ORDERED** in Orlando, Florida on January 14, 2015.

_____
PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel of Record